THE PRESIDENT, MANAGERS, AND COMPANY FOR ERECTING A BRIDGE OVER THE RIVER DELAWARE AT OR NEAR TRENTON *vs.* THE TRENTON CITY BRIDGE COMPANY and others.

Upon principles of public law, it is clear that the power of erecting a bridge, and taking tolls thereon, over a navigable river which forms the coterminous boundary between two states can only be conferred by the concurrent legislation of both states.

When the power to make and maintain such bridge, and take tolls thereon, has been given by the joint legislature of both states, the principle could hardly be admitted, that either state, by its separate legislation, could declare that no other bridge should be built across such river within certain limits, and thus render the franchise exclusive.

By the agreement entered into between the states of New Jersey and Pennsylvania, the river Delaware, in its whole length and breadth, is to be and remain a common highway equally free and open for the use of both states, and each state is to enjoy and exercise concurrent jurisdiction within and upon the water between the shores of said river. Both states concurred in granting to complainants the right to erect and maintain their bridge, and take tolls thereon. The legislature of New Jersey afterwards passed an act declaring " that it should not be lawful for any person or persons whatsoever to erect, or cause to be erected, any other bridge or bridges across the said river Delaware at any place or places within three miles of the bridge to be erected."

*Held*, that even if it was the intention that this act should take effect without the assent of the state of Pennsylvania, that it is void on the

ground that it is in contravention of the agreement above mentioned between the two states. As neither state, by the exercise of her sole jurisdiction, has the right, by the terms of the agreement, to grant the franchise, so neither can lawfully contract to refuse to grant it.

Under the circumstances, as exhibited in the case, it was *further held,* that the act of 1801, which conferred the exclusive privilege on the complainants, was not designed by the legislature of New Jersey to go into effect until the same had received the assent of the legislature of Pennsylvania.

Whether a corporation has violated its charter or forfeited its franchise, is a question solely for the determination of a court of law.

But when a bridge company, setting up an exclusive right within certain limits, asks an injunction to prohibit the building a bridge within such limits, a court of equity will not lend its assistance when it appears from the answer that the bridge of the complainants has been so far appropriated to the uses of a railroad as to render it inconvenient and dangerous for ordinary travel.

---

This case came before the court on a motion for an injunction, and was argued on bill and answer.

*M. Beasley* and *Attorney General,* for complainants.

*B. Gummere* and *P. D. Vroom,* for defendants.

THE CHANCELLOR. The complainants are the proprietors of an existing bridge across the river Delaware at Trenton. They were incorporated by the concurrent legislation of the states of New Jersey and Pennsylvania, and claim and exercise the unquestioned right of taking tolls upon the said bridge by the authority of both states. They claim to have the *exclusive* franchise of having a bridge and of taking tolls for the distance of six miles up and down the river, so that no other bridge can be erected within three miles of their bridge upon either side of it. The defendants are also a body politic, created by the concurrent legislation of both states, with authority to erect a bridge across the Delaware at the city of Trenton. They are now engaged, under the provisions of their charter, in erecting a new bridge across the river within a mile of the complainants' bridge, and which it is ad-

mitted will divert a portion of the travel which now crosses at the old bridge. The complainants ask a perpetual injunction to restrain the defendants from erecting the bridge now in the course of construction, or any bridge whatever, within three miles of the existing bridge in violation of their chartered rights. Both parties have express legislative sanction for their respective claims. The complainants rest their claim to the exclusive franchise upon the authority of a grant from the legislature of New Jersey only. The defendants claim their franchise under the authority of a grant from both states. The complainants' grant is prior in point of time, and if valid, is fatal to the claim of the defendants.

Two questions are to be considered.

I. Are the complainants invested with the *exclusive* franchise of having a bridge and taking toll within the limits claimed in their bill.

II. If they are, are they entitled to the exercise of the restraining power of this court to protect them in the enjoyment of their franchise.

Before proceeding to a direct examination of these questions, it is well to notice, as preliminary to the main inquiry, that no reliance is placed by the complainants in support of their claim upon the doctrine, that the grant of the franchise of taking tolls by the states of New Jersey and Pennsylvania raises, by necessary *implication*, an *exclusive* grant. They claim no authority whatever, express or implied, from Pennsylvania for their *exclusive* franchise. Both in their bill and upon the argument they rely for their exclusive privilege solely upon the express grant of the legislature of this state. The doctrine, therefore, that the grant of a franchise necessarily implies that government will not directly or indirectly interfere with it, so as to destroy or materially impair its value, and that an interference by the creation of a rival franchise would be in fraud of the grant, is in no wise drawn in question in this case.

On the other hand, the defendants do not deny that, if the complainants are invested under their charter with the exclusive franchise claimed in their bill of complaint, any law destroying that franchise, or materially impairing its value, is unconstitutional and void. The principle has been so repeatedly recognised by the highest judicial tribunals of the Union, and is so firmly established by a firm course of judicial decision in New Jersey, that it cannot be regarded in this court as an open question. *Dartmouth College* v. *Woodward,* 4 *Wheat.* 518.

These positions being adopted as settled or admitted principles in the conduct of the inquiry, the field of investigation is reduced to a narrow compass. Had the legislature of New Jersey power to confer upon the complainants the *exclusive* franchise claimed in their charter? And if they had the power, has it been exercised?

The complainants claim the franchise of having a bridge across the river Delaware, connecting the states of New Jersey and Pennsylvania, and of taking tolls thereon. The river is the boundary between the two states, a public navigable river, and upon principles of international law, the middle of the channel forms the line of separation between the territories of the adjacent states. *Wheaton's Elements of International Law* 252. By the agreement between the two states, made and ratified in 1783, it is declared—

1st. That the river Delaware, from the station point or northwest corner of New Jersey to the place upon the said river where the circular boundary of the state of Delaware toucheth upon the same, in the whole length and breadth thereof, is and shall continue to be and remain a common highway, equally free and open for the use, benefit, and advantage of the said contracting parties; provided nevertheless, that each of the legislatures of said states shall hold and exercise the right of regulating and guarding the fisheries of the said river Delaware annexed

to their respective shores, in such manner that the said fisheries may not be unnecessarily interrupted, during the season for catching shad, by vessels riding at anchor on the fishing ground, or by persons fishing under claim of a common right on said river.

2d. That each state shall enjoy and exercise a concurrent jurisdiction within and upon the waters, and not upon the dry land, between the shores of said river. *Nix. Dig.* 825.

Independent of the provisions of this agreement, upon principles of public law, it would seem to be a principle too clear to admit of doubt, that the power of erecting a bridge within the territories of both states, and of taking tolls thereon, could only be conferred by the concurrent legislation of both states. Neither state can, of its own authority, authorize a corporation to place piers, to erect a bridge, and construct a highway over the navigable waters and within the territory of an adjacent state, much less can it confer upon such corporation the franchise of taking tolls within the territory of such state. That franchise is a branch of the sovereign prerogative. The conferring of it is an exercise of sovereign power, and the right can only be exercised within the territory of the sovereignty that confers it. The principle, that New Jersey, alone, could neither confer the power of building the bridge or of taking tolls within the territory of Pennsylvania, is too clear to admit of dispute or to require an authority in its support. The principle was recognised and acted upon in the case of *Middle Bridge Corporation* v. *Marks*, 26 *Maine R.* 326.

It is not understood that the counsel of the complainants deny this principle. They claim, indeed, that their clients have the right of maintaining the bridge and of taking tolls by the joint legislation of both states, and that, having such right conferred, either state may make the franchise exclusive. Their position, if correctly understood, is their having acquired the undoubted fran-

chise of having the bridge and taking tolls by the legislative authority of both states ; either state may make that right exclusive by contracting to grant no other charter. They may contract to do what without contract they may lawfully do, *viz.* refuse to grant any further franchise. The position, though certainly plausible, does not seem to me to be tenable. It amounts to this, that although the consent of both states is necessary to confer the franchise of taking tolls at any given point upon the river, yet that right once granted, either state may, at its pleasure, by its own legislation and for its own advantage, make that grant exclusive throughout the whole extent of the river. Irrespective of the terms of the agreement of 1783 between the two states, I repeat that I should hesitate to accept the position as tenable.

But the case is made much stronger against the complainants by the terms of the agreement between the states. It is thereby expressly declared that the river Delaware, in its whole length and breadth, is to be and remain a common highway, equally free and open for the use, benefit, and advantage of both states, and that each state shall enjoy and exercise a concurrent jurisdiction within and upon the water between the shores of said river. Now, if it be admitted that it is not the necessary construction of this agreement that it prohibits each state, upon its sole authority, from authorizing the construction of a bridge, even from its own shore to the centre of the river within its own territory, provided such bridge does not interfere with the navigation of the river as a highway, such construction is certainly warranted by the terms of the agreement. It may, perhaps, be held that each state might, without a violation of the contract, authorize the erection of a bridge to the centre of the river within its own territory, and the taking of tolls thereon ; and yet such is not the practical construction which has been given to its terms. Neither state has ever attempted to make such a grant ; on the contrary, it is believed that in

the charters of the numerous bridges which now span the river from the north station point to tidewater, each state has invariably granted the privilege of building the bridge and of taking tolls, not only within its own territory but from shore to shore, thus exercising, in the language of the agreement, concurrent jurisdiction between the shores of the river. In the charter of the complainants, power is not given by the legislature of New Jersey merely to erect a bridge within the limits of this state, to unite with a structure authorized by the legislature of Pennsylvania within the territory of that state, but power is given to erect the bridge across the river from shore to shore, and the grant is made upon the express condition that it shall not be operative until the legislature of the state of Pennsylvania shall confer the like power and authority to erect the said bridge, and extend the same from the shore on the west side of the river across the same to its opposite shore, thus treating the franchise of erecting the bridge within the shores of the river as an entirety to be granted only by the concurrent legislation of both states. If, then, New Jersey, by the exercise of her sole jurisdiction, had no right, by the terms of the agreement, within the shores of the river, even within her own territory, to grant the franchise, can she lawfully contract to refuse to grant it? Does not the right of refusing to grant involve necessarily the power of granting? But the contract not to grant to others involves the grant of a franchise to the complainants, and, as has been said, the state, by virtue of its sole authority to grant such franchise. I conclude, therefore, that the alleged grant of the franchise claimed by the complainants by the sole authority of New Jersey, without the consent of Pennsylvania, was invalid and inoperative.

But admitting the power of the legislature to grant the franchise, was the grant made or intended to take effect without the consent of the legislature of Pennsylvania?

The complainants claim to be a corporation, and to ex-

ercise their corporate franchises by virtue of an act passed by the legislature of New Jersey on the 3d of March, and ratified by the state of Pennsylvania on the 4th of April, 1798. *Pamph. L. of N. J.* 321; 5 *Carey & Bioren's Laws of Penn.* 348. The act does not directly incorporate the company, but authorizes the governor, when it shall be certified to him that a certain number of shares of stock shall have been subscribed, to create and erect, by letters patent, the subscribers into a body politic and corporate. By the last section of the act, it is enacted as follows : " Nothing in this act shall be deemed, taken, or construed to authorize or empower the governor to incorporate or empower any persons subscribing as aforesaid, or shall give any power or authority to such subscribers to do any act, matter, or thing herein mentioned, until such time as the legislature of the state of Pennsylvania shall by law vest the *like* powers and authority in such subscribers to erect the said bridge, and extend the same from the shore on the west side of the said river, at or near Trenton, across the same to its opposite shore, with as full and ample powers, privileges, franchises, and emoluments as to the subscribers are herein given ; and the said subscribers, having such authority, shall be incorporated as aforesaid."

The original act of both states confers upon the corporation the same powers, privileges, and franchises, and contains the same provisions, with the exception of the 9th section of the act of this state, which was inserted in its passage through the house of assembly on the petition of a citizen of Trenton, praying that, if the law should pass, the company should be required to build the bridge at the head of or above the falls at Trenton, or that a clause should be inserted in the bill by which the company should be compelled to make compensation for any damages occasioned by building the bridge. *Minutes of Assembly, February* 15*th,* 1798, *p.* 32.

It is abundantly manifest from the provisions of the act

E*

of 1798, as adopted by both states, not only that all the corporate powers and franchises of the company were in fact conferred by the concurrent legislation of both states, but that the assent of each state was expressly required and declared to be necessary by the legislature of the other to the validity of the grant.

This act contains no grant of an exclusive franchise. But, on the 26th of February, 1801, the legislature of New Jersey passed an act to alter and amend the act of 1798. This act contains four sections, the 4th and last of which is as follows: "It shall not be lawful for any person or persons whatsoever to erect, or cause to be erected, any other bridge or bridges across the said river Delaware at any place or places within three miles of the bridge so to be erected by virtue of the before recited act." This act contains no provision, in express terms, rendering the assent of the legislature of Pennsylvania necessary to its validity. The complainants claim that the fourth section operates as a valid grant of the *exclusive* franchise of having a bridge and taking toll within the designated limits.

If the views which have already been expressed are correct, the legislature had no power to make such grant without the assent of the legislature of Pennsylvania. If such assent was necessary, the grant would not only be inoperative without it, but the court would be bound to presume not that the legislature passed an illegal and void act, but that it was in contemplation of the subsequent assent of the legislature of Pennsylvania. The terms of the act itself, and the circumstances under which it was enacted, lead to the same conclusion.

By the act of 1798, the same powers, franchises, and privileges were granted by the legislatures of both states. The act, as passed in each state, contains the provision already cited, *viz.* that the act should be inoperative until such time as the legislature of the other state should confer on the corporation the like power and authority,

&c., with as full and ample powers, privileges, franchises, and emoluments as are given in said act. It was in fact a condition of the grant by each state that the other should make a like grant. The condition failing, the grant failed. Now was the condition fulfilled by a literal compliance with its terms? If a similar act had been passed by Pennsylvania, which was void by the constitution of that state, or if a similar valid act had been passed by that state, but repealed or essentially modified before the grant of the letters patent, the condition would not have been fulfilled, and the act of this state would have been inoperative and void.

Now the act of 1801 was passed before the grant of letters patent by either state—before the company was incorporated or the charter accepted. The company was erected into a corporation by letters patent, granted by the executive of New Jersey, on the 1st of August, 1803, and by the governor of Pennsylvania, on the 16th of the same month. The letters patent of the executive of this state refer both to the original act of 1798 and the act of 1801, and authorize the corporation to have, hold, exercise, and enjoy the powers, authorities, rights, privileges, and franchises in the said *acts* given, granted, and specified.

The letters patent of the governor of Pennsylvania contain no such clause. They erect the company into a corporation with the powers and franchises conferred by the act of 1798, and none other.

The issuing of the letters patent was an executive act—the mere execution of a power—and could confer no right or franchise not granted or authorized by the acts of the legislature. If, then, the act of 1801 was intended to take effect, and did take effect, without the assent of Pennsylvania—if it materially altered or was repugnant to the powers, provisions, and franchises granted by the act of 1798, then the executive of Pennsylvania had no authority to grant the letters patent or to incorporate the company.

The condition upon which the legislature of that state had authorized the charter had failed, *viz.* that New Jersey should confer similar powers and franchises upon the corporation. Now the act of 1801, and every section of the act, does alter most materially the powers, privileges, and franchises of the corporation and of the individual corporators.

By the 3d section of the act of 1798, it was provided that no stockholder should have over twenty votes, whatever might be the number of his shares. By the 1st section of the act of 1801 this provision was repealed, and each stockholder declared to be entitled to one vote for every share held by him, thus changing the powers of the stockholders and the control of the corporation. How was the company ever to be organized? Had the stockholders different rights in the two states, and did those rights depend upon the place of meeting? The 2d section of the act of 1801 confers upon the corporation powers of forfeiting stock and of suing the holders of shares for nonpayment of instalments not conferred by the original act.

By the 16th section of the act of 1798, if at the end of two years the clear income of the bridge would not bear a dividend of six per cent. per annum upon the capital expended, the company were authorized to increase their tolls so as to raise the dividends to six per cent. per annum, and maintain such increased rate of tolls, provided the clear income would not produce a dividend of more than fifteen per cent. per annum. By the 3d section of the act of 1801 this section is repealed. The franchise of taking such increased rate of tolls is taken from the corporation, and the privilege is conferred upon the states of New Jersey and Pennsylvania, or either of them, of taking the bridge and its appurtenances at a valuation after the expiration of fifteen years from its completion.

The 4th section of the act of 1801 contains the grant of the exclusive franchise claimed by the complainants, and which forms the subject of the present controversy.

Can it be conceived that the legislature would have passed that act, or that the company would have accepted it, intending that it should go into operation without the assent of the legislature of Pennsylvania? Would the legislature have altered the rights of the stockholders, impaired the franchises, made provision for the purchase of the bridge and its appurtenances by New Jersey, without the consent of the legislature of Pennsylvania? Would the company have accepted such act, knowing that the ratification of the charter by Pennsylvania and all the franchises of the company were dependant upon the condition that the same powers and franchises should be granted by New Jersey? The act of 1801 must have been passed by the legislature, and accepted by the company, in contemplation of its being concurred in by the legislature of Pennsylvania. Without such assent it neither had, nor was intended to have, any vital power.

I am of opinion, therefore, that, by the act of 1801, the complainants are not invested with the *exclusive franchise* claimed in their bill.

There is another question raised by the answer, upon which (the parties are entitled to the opinion), in justice to the parties, it is right that an opinion should be expressed. The answer alleges that, in violation of the charter, the bridge of the complainants has been converted to the purposes, and is constantly used for the transit of locomotives with trains of cars; that the bridge is thereby, for the purposes of ordinary travel, rendered inconvenient, insecure, and dangerous, and the rights, interests, and convenience of the public in the enjoyment of the bridge impaired, and the passage of the bridge by ordinary travel between the two states interrupted.

Whether the complainants have violated their charter or forfeited their franchise is a question solely for the determination of a court of law, and not within the cognizance of a court of equity. It may be, and for the purposes of this argument it will be assumed, that the

complainants have a right, in law and in consistency with their charter, to use their bridge for the purposes of a railroad. But if by so doing the great purpose of their charter, the use of their bridge for the purposes of ordinary travel, is seriously impaired—if travelling by ordinary vehicles is rendered inconvenient, insecure, and dangerous—if the convenience and benefit of the public, for whose advantage the franchise was granted, are sacrificed to the pecuniary interests of the corporation, the complainants do not stand in a position to ask the interposition of the extraordinary powers of a court of equity for their relief. The granting of an injunction always rests in the sound discretion of the court, and when upon the answer, which for the purposes of this case must be taken as true, it appears that the great purpose of the grant, the convenience of the ordinary purposes of travel, is seriously impaired, the court will deny the injunction, and leave the complainants to their remedy at law.

The injunction is denied with costs.

In concluding this opinion, I cannot forbear the expression of my regret that more time has not been afforded for the investigation of the important questions arising in this cause than has been permitted by the short time which has elapsed since the argument, and by the incessant interruptions to which I have been exposed by the calls of official duty. I would gladly have held the case for further investigation, but justice to the parties demands that the decision should be promptly rendered.